**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>CHRISTIANE FISCHER,<br><br>Defendant. | ) | Criminal Action No. 1:22-CR-10309-AK |

**MEMORANDUM AND ORDER ON MOTION FOR FORFEITURE**

**ANGEL KELLEY, D.J.**

Defendant Christiane Fischer was convicted after a jury trial for one count of Money Laundering Conspiracy in violation of 18 U.S.C. § 1956(h). [Dkt. 124]. The Government now seeks a Preliminary Order of Forfeiture with respect to three parcels of real property involved in the offense: (1) 195 Washington Street, Peabody, Massachusetts; (2) 369 Salem Street, Malden, Massachusetts; and (3) 34 Alexandra Road, Lynnfield, Massachusetts. [Dkt. 160]. Defendant opposes the Motion, arguing that the Government has failed to prove a factual nexus between the properties and the offense and that the total amount of forfeiture constitutes an excessive fine in violation of the Eighth Amendment. [Dkts. 152; 168]. For the following reasons, the Government's Motion for Preliminary Order of Forfeiture [Dkt. 160] is **GRANTED**.

## I. BACKGROUND

### A. Factual Background

The following undisputed facts are drawn from the presentence report and accepted as true unless otherwise noted. See United States v. Occhiuto, 784 F.3d 862, 868 (1st Cir. 2015). On November 16, 2022, Defendant Christiane Fischer was indicted for participating in a money laundering conspiracy with her partner, as well as an individual named Philip Morose, his

mother, and other individuals from August 2016 to June 2018. [Dkt. 156 ¶ 8]. Defendant was the sole owner of several car rental businesses in Massachusetts, including PK Motor Cars, Inc. ("PK Motors"), and Uni Auto Rental, Inc., and Uni Auto Center, Inc. (together, "Uni Rentals") [Id. ¶¶ 71-73]. Defendant and her partner were responsible for the day-to-day operations of the companies. [See id. ¶ 73]. Morose and his mother were employees for Defendant's car rental businesses and were tasked with duties such as purchasing cars at auctions. [See Dkt. 137 at 60, 223].

From 2014 to 2018, Morose engaged in drug trafficking more than $2 million worth of fentanyl pills into Massachusetts. [Dkt. 156 ¶ 9]. Between 2016 and 2018, as part of the money laundering conspiracy, Defendant deposited cash into multiple bank accounts, transferred funds among those bank accounts, and purchased multiple properties, including a house valued at over $750,000 and commercial real estate for her car rental businesses. [Id. ¶¶ 11-14]. Morose lived in the purchased house until he had to vacate during renovations, which cost over $450,000 and which he paid for in cash. [Id. ¶ 13]. Morose also purchased multiple vehicles under Defendant's business' name, including a Chevrolet Tahoe and a BMW i8. [Id. ¶¶ 15-19]. Morose used at least some of these vehicles to traffic drugs to Massachusetts. [See id.]. For example, in May 2018, he installed a hidden compartment in the Chevrolet Tahoe for the purpose of concealing drugs. [Id. ¶ 19; Dkt. 135 at 132-34].

Morose's co-conspirator in this drug trafficking operation became a cooperating witness for the Government. [See Dkt. 156 ¶ 9]. In June 2018, at the direction of investigators, the individual and Morose arranged to have an associate, who was an undercover agent, deliver fentanyl pills to Morose in Massachusetts in exchange for over $20,000 in cash. [Id.]. On June 4, 2018, Morose met with that undercover agent to make the planned exchange and was

subsequently arrested. [Id. ¶ 10].

**B. The Properties**

Three parcels of real property are the subject of the instant Motion for Preliminary Order of Forfeiture. The evidence at trial, as well as the parties' briefing on the Motion, presented the following facts about each property.

**1. The Lynnfield Property**

On December 30, 2016, Defendant and her husband purchased 34 Alexandra Road, Lynnfield, Massachusetts (the "Lynnfield Property"), for approximately $750,000, allegedly to serve as a rental property. [See Dkt. 152 at 5]. The property was purchased under the name of PK Motors. [See Dkt. 136 at 220]. At the time, Morose was an employee with PK Motors and had experience with renting, and thus Defendant allowed him to live in the house with his girlfriend. [See Dkt. 152 at 5]. In 2017, Morose arranged for $451,680 in kitchen and basement renovations and pool construction, which he paid for in cash. [Dkts. 156 ¶ 13; 136 at 92]. On April 14, 2017, Defendant transferred the Lynnfield Property from PK Motors to Uni Realty Group, LLC ("Uni Realty"), allegedly for tax-related reasons. [Dkt. 136 at 221]. On June 25, 2018, following Morose's arrest, Defendant quitclaimed the deed and transferred it from Uni Realty to her own name. [Id. at 221-22].

**2. The Peabody Property**

Defendant operated PK Motors at 195 Washington Street, Peabody, Massachusetts (the "Peabody Property"). [Id. at 145]. She first took over operations of the business in 2012, which included overseeing vehicle sales, repairs, dealing, and rentals. [See id. at 145-56; Dkt. 152 at 3]. For several years prior to Morose's employment, Defendant was involved in separate lawsuits over the property with the landlord. [Dkt. 152 at 3]. Ultimately, she entered a negotiated

settlement on March 16, 2017, allowing her to purchase the property for approximately $800,000 on June 16, 2017. [Id.]. Defendant allegedly built her car rental business at the Peabody Property for years prior to the money laundering conspiracy with Morose. [Id.].

### 3. The Malden Property

As the car rental business expanded at PK Motors, and Defendant learned that her insurer would not expand coverage for the Peabody Property, Defendant purchased 369 Salem Street, Malden, Massachusetts (the "Malden Property") on June 16, 2017, for approximately $275,000, to meet growing customer demand. [Id. at 3-4]. She operated Uni Rentals and Uni Realty out of the Malden Property, where she purchased additional vehicles and expanded PK Motors' inventory. [Id.]. Because Defendant allegedly could not obtain additional insurance coverage in her own name, she established Uni Rentals under Edith Morose's name. [Id. at 4].

### C. Procedural History

A jury trial for Defendant was held on November 17 to 24, 2025, after which the jury returned a guilty verdict for one count of Money Laundering Conspiracy in violation of 18 U.S.C. § 1956(h). [Dkt. 124]. On October 6, 2026, Defendant filed an objection to forfeiture as listed in the Indictment. [Dkt. 152]. The Government moved for a Preliminary Order of Forfeiture on October 22, 2026 [Dkt. 160], and filed a response to Defendant's objection on October 23, 2026. [Dkt. 163]. The Court held a Status Conference with the parties on October 27, 2026 [Dkt. 167], after which the parties filed supplemental memoranda regarding forfeiture [Dkts. 168; 169]. The Court heard the parties for oral argument on October 29, 2026. [Dkt. 171].

## II. DISCUSSION

The Government seeks a Preliminary Order of Forfeiture pursuant to the criminal forfeiture statute, 18 U.S.C. § 982(a)(1), which provides that a court imposing a sentence on a

person convicted of, *inter alia*, money laundering conspiracy "shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property." Id. The Government contends that the Peabody Property, the Malden Property, and the Lynnfield Property are forfeitable because they were "involved in" the money laundering conduct that Defendant was convicted for. Defendant objects to the forfeiture, arguing that at least some of the funds used to purchase the properties were legitimately derived and thus not subject to forfeiture. She also argues that even if the properties are forfeitable, such forfeiture would be an excessive fine under the Eighth Amendment because the total value of the properties exceeds the maximum fines under both the U.S. Sentencing Guidelines and the money laundering statute.

**A. Factual Nexus**

Defendant first contends that the properties are not forfeitable because at least some of the funds used to purchase the properties were derived from legitimate sources. In support, Defendant cites United States v. Robertson, 162 F.4th 209 (1st Cir. 2025), in which the First Circuit vacated a forfeiture order of $177,600 because the government failed to prove by a preponderance of the evidence that the funds were "traceable to" the underlying offense of wire fraud. Id. at 253 (quoting 18 U.S.C. § 981(a)(1)(C)).

As an initial matter, Robertson is inapplicable in this context, as that case involved the civil forfeiture statute, 18 U.S.C. § 981(a)(1)(C). Under that statute, a criminal defendant must forfeit property that "constitutes or is derived from proceeds traceable to a violation of" an underlying offense. 18 U.S.C. § 981(a)(1)(C). The Robertson court thus interpreted the phrase "traceable to." 162 F.4th at 253. By contrast, here, the Government moves pursuant to the criminal forfeiture statute, 18 U.S.C. § 982(a)(1). Under that statute, a criminal defendant must

forfeit property that is "involved in" *or* "traceable to" an underlying offense. Id. The criminal forfeiture statute thus expands the types of property subject to forfeiture to include those that are "involved in" an offense. See United States v. Reiner, 397 F. Supp. 2d 101 (D. Me. 2005) ("Unlike forfeiture under section 981(a)(1) . . . forfeiture under section 982 is not limited to amounts 'obtained by' the defendant but extends to 'any property . . . *involved in* such offense.'" (emphasis added)); id. ("The plain language of section 982(a)(1) suggests that the scope of the forfeiture under [the criminal forfeiture statute] is at least as broad as, probably broader than, [the civil forfeiture statute]."). Thus, Robertson does not dictate the outcome here.

Instead, the First Circuit articulated the applicable standard for assessing whether property was "involved in" an underlying offense in United States v. McGauley, 279 F.3d 62 (1st Cir. 2002). There, the court explained that Congress intended the phrase "property . . . involved in" to be construed broadly to "include the money or other property being laundered (the corpus), any commissions or fees paid to the launderer, and any property used to facilitate the laundering offense." Id. at 76 n.14 (quoting 134 Cong. Rec. § 17365 (daily ed. Nov. 10, 1988)). As such, "even legitimate funds that are commingled with illegitimate funds can be forfeited if the legitimate funds were somehow involved in the offense, such as by helping to conceal the illegal funds." United States v. Aguasvivas-Castillo, 668 F.3d 7, 17 (1st Cir. 2012) (quoting McGauley, 279 F.3d at 76).

Applying this standard, the trial record reflects that the funds used to purchase the Malden Property, Peabody Property, and Lynnfield property were "involved in" the underlying money laundering conspiracy.[1] Specifically, and as explained in more detail below, the

[1] Defendant does not appear to dispute that the three properties constitute "proceeds" under 18 U.S.C. § 981(a)(2). The Court thus does not address that issue here. See United States v. Ponzo, 171 F.4th 507, 518 (1st Cir. 2026).

Government produced evidence that Defendant commingled legitimate funds derived from her car rental business with illicit laundered funds, and that such commingling facilitated the money laundering scheme by disguising the nature and source of the funds.

**1. The Lynnfield Property**

The evidence adduced at trial showed that Defendant purchased the Lynnfield Property using cash derived from laundered funds, and that she layered cash deposits with legitimate income in PK Motors bank accounts to conceal the source of the funds. Defendant, Morose, and a third party withdrew approximately $750,000 from PK Motors' bank accounts to fund the purchase of the Lynnfield Property between October and December 2016. [See Dkt. 156 ¶ 11]. Specifically, the Government offered testimony and evidence showing that in October and November 2016, PK Motors funded down payments totaling $37,750. [See Dkt. 136 at 203-04]. Then, in November and December 2016, Morose deposited $676,009 into six different PK Motors bank accounts through 27 separate transactions, and Defendant deposited $247,000 in cash into several PK Motors bank accounts around the same time. [See id. at 204-10]. Simultaneously, Defendant entered classifications in PK Motors' accounting system that obfuscated the origin of the deposited cash. For example, Defendant classified $100,000 cash deposits by herself on November 17, 2016, and by Morose on December 1, 2016, as an "Insurance Claim," but provided no evidence that her insurance company pays its claims in cash. [See id. at 191]. Defendant and Morose then paid the balance of $717,099 owed at the closing for the Lynnfield Property via three separate cashier's checks drawn from three different PK Motors bank accounts. [See id. at 201]. Specifically, on December 6, 2016, the Defendant withdrew $150,000, on December 29, 2016, Morose withdrew $230,000, and on December 30, 2016, Morose withdrew $337,099.83, and each of the cashier's checks were payable to the same

law firm handling the closing for the Lynnfield Property. [See id. at 204-05, 209].

This record shows, by a preponderance of the evidence, that a significant amount of the funds used to purchase the Lynnfield Property derived from Morose's drug trafficking activities, and that Defendant commingled these illicit funds in PK Motors bank accounts to conceal the source of the funds. Thus, the funds used to purchase the Lynnfield Property were "involved in" the underlying money laundering conspiracy and constitute forfeitable property.

**2. The Peabody Property**

Evidence adduced at trial also shows, by a preponderance of the evidence, that Defendant purchased the Peabody Property using proceeds derived from Morose's drug trafficking activity, and that Defendant allowed Morose to conceal the origin of the proceeds through commingling the funds with legitimate income in PK Motors bank accounts. Prior to Morose's involvement with PK Motors in 2016, the trial evidence reflected that Defendant was generally only able to purchase properties through financing. For example, between July 2012 and July 2016, PK Motors financed the purchase of 153 vehicles at a cost of $1,001,294, with financing fees equal to $51,600. [Id. at 162-63]. Similarly, in May 2016, Defendant's partner fully financed their purchase of a home for $456,000. [Dkt. 138 at 152]. However, in 2017—including the time period immediately prior to the purchase of the Peabody Property—Defendant's bank deposit records reflected that cash deposits in PK Motors' bank accounts increased substantially. [Dkt. 137 at 85-88]. The trial evidence also showed that Morose had significant control over PK Motors' finances. For example, in 2016, Morose financed the purchase of vehicles for PK Motors's rental fleet, was an authorized signor on several PK Motors bank accounts, and was named as a company's Chief Executive Officer. [Dkts. 136 at 180; 137 at 235].

From this evidence, the Courts finds, by a preponderance of the evidence, that the cash

inflows into PK Motors' business accounts immediately prior to the purchase of the Peabody Property came in substantial part from Morose. Moreover, by allowing Morose to use PK Motors' accounts to deposit cash and naming him as an officer of the company, Defendant concealed the illicit nature of the source of the funds by commingling legitimate with illegitimate money. Because the Peabody Property was purchased using these commingled funds, the Peabody Property also constitutes forfeitable property.

**3. The Malden Property**

Finally, in a substantially similar manner to the Peabody and Lynnfield Properties, the record reflects that Defendant used commingled funds to purchase the Malden Property. On June 16, 2017, Defendant purchased the Malden Property for approximately $275,000. [Dkt. 152 at 4]. On December 31, 2016, the combined balance in PK Motors' bank accounts was $133,359. [Dkt. 136 at 216]. Between January 1, 2017, and April 6, 2017, Morose deposited $162,040 into PK Motors bank accounts. [Id. at 224]. Thus, it is reasonable to infer that at least half of the funds used to purchase the Malden Property came from Morose. And because Defendant allowed Morose to use PK Motors' accounts in an effort to conceal the illicit source of the funds (as described in the Court's analysis of the Peabody Property), Defendant unlawfully commingled funds. As a result, the Malden Property is also forfeitable.

**B. Excessive Fine**

Having concluded that the three properties are forfeitable, the Court turns to Defendant's alternative argument that ordering forfeiture of these properties would violate the Excessive Fines Clause. According to Defendant, the present market value of the properties exceeds both the statutory maximum fine for money laundering conspiracy and the maximum fine range under the U.S. Sentencing Guidelines. She also argues that her individual conduct and the

circumstances of the case do not warrant such a forfeiture. The Government responds that the requested forfeiture does not exceed the statutory maximum, and even if it does, the facts of the case support forfeiture of all three properties.

In United States v. Bajakajian, 524 U.S. 321 (1998), the Supreme Court explained that "[a] criminal forfeiture is unconstitutional under the Excessive Fines Clause if it is 'grossly disproportional to the gravity of the defendant's offenses.'" United States v. Levesque, 546 F.3d 78, 83 (1st Cir. 2008) (quoting Bajakajian, 524 U.S. at 337). To determine whether a forfeiture is grossly disproportional, a court should consider three factors: "(1) whether the defendant falls into the class of persons at whom the criminal statute was principally directed; (2) other penalties authorized by the legislature (or the Sentencing Commission); and (3) the harm caused by the defendant." Id. (quoting United States v. Heldeman, 402 F.3d 220, 223 (1st Cir. 2005)). In addition to these three factors, a criminal defendant may also argue that "forfeiture would deprive [him or her] of his or her livelihood." Id. (citing Bajakajian, 524 U.S. at 335). The defendant bears the burden of demonstrating that a criminal forfeiture is unconstitutional. See United States v. Jose, 499 F.3d 105, 108 (1st Cir. 2007).

The parties principally dispute the second Bajakajian factor concerning whether the requested forfeiture exceeds the maximum fine authorized by the Sentencing Guidelines and the money laundering statute. The Sentencing Guidelines in this case authorize a maximum fine range of $25,000 to $250,000,[2] or as provided by statute. See U.S. Sent'g Guidelines § 5E1.2(c)(3) (U.S. Sent'g Comm'n 2025). In turn, the money laundering statute sets a maximum fine of "$500,000 or twice the value of the property involved in the transaction,

---

[2] This range is based on the Court's preliminary determination that the offense level for Defendant is 24, which is subject to change following sentencing. [See Dkt. 175].

whichever is greater." 18 U.S.C. § 1956(a)(1). Following a hearing with the parties, the Court has preliminarily determined that the value of property involved in the underlying action is $1,509,580.50. [Dkt. 175]. Therefore, the statutory maximum is twice that amount, or $3,019,161.

The parties disagree over the appropriate method for valuing the three parcels of property for purposes of the excessive-fines analysis. The Government contends that the property should be valued at their original purchase price, i.e., approximately $1.5 million in total. Under this view, the requested forfeiture is only half the statutory maximum. Defendant argues that they should be valued at their total current market price, which she alleges is approximately $4.2 million. [See Dkt. 152 at 1-2]. Under Defendant's view, the requested forfeiture exceeds the statutory maximum by approximately $1 million.

The Court agrees with Defendant that the properties subject to forfeiture should be valued at their present fair market value. The Government correctly observes that appreciation in the value of forfeitable property may itself be subject to forfeiture. See United States v. Em, No. 23-CR-10009, 2024 WL 4171435, at *2 (D. Mass. Sep. 12, 2024) (citing United States v. Hawkey, 148 F.3d 920, 928 (8th Cir. 1998); United States v. Real Property Identified as: Parcel 03179-005R, 287 F. Supp. 2d 45, 59-60 (D.D.C. 2003)) (upholding forfeiture of $195,959.10, which constituted appreciated equity in real property). However, the question of whether appreciated value is forfeitable is distinct from whether forfeiture of that value comports with the Excessive Fines Clause. Even when the full value of the asset is forfeitable, the resulting forfeiture remains subject to constitutional review for excessiveness.

Indeed, as the Supreme Court explained in Bajakajian, criminal forfeitures are fundamentally punitive in nature and seek to punish the individual defendant's conduct rather

than compensate the government for a loss, operate as disgorgement, or serve as restitution to an identifiable victim. 524 U.S. at 328-33. Viewed in this way, present fair market value provides a more appropriate measure of the economic value of the property that a defendant would lose through forfeiture. The original purchase price, by contrast, reflects a historical transaction that may bear little relation to the value of the property at the time of forfeiture. Using present market value ensures that the Court assesses the full economic impact of the proposed forfeiture on the defendant's financial circumstances and whether the forfeiture is grossly disproportional to the gravity of the offense.

Applying this method, Defendant represents that the value of the properties that the Government seeks to forfeit is $4.2 million. That amount exceeds the statutory maximum fine of $3,019,161 by $1,380,839, or an approximate magnitude of 1.4 times. This disparity is substantial, particularly as the Government provides no First Circuit authority—and the Court identifies none through its own independent research—upholding forfeiture amounts that exceed the statutory maximum.[3] That said, at least two appellate courts have upheld fines exceeding the statutory maximum by a magnitude of two. Cf. United States v. Wallace, 389 F.3d 483, 486-87 (5th Cir. 2004) (finding that a forfeiture of a $30,000 airplane was not grossly disproportionate to the $15,000 statutory maximum under a predecessor statute because the airplane's value "differs

[3] The only case the Government cites for this specific proposition is United States v. Aguasvillas-Castillo, 668 F.3d 7 (1st Cir. 2012), in which the First Circuit upheld a $20 million forfeiture. The Government appears to argue that Aguasvillas-Castillo involved a statutory maximum fine of $4.4 million, which was the defendant's personal gain from the underlying fraud activity. See id. at 17. However, the court explained that the total value of funds involved in the transaction included legitimate funds commingled with illicit proceeds to conceal the offense, which, together, was over $28 million. See id. at 11, 17. Thus, the statutory maximum in that case was higher than $20 million.

The Government also cites Em, but there, the forfeiture value "represent[ed] 19.6% of the [maximum] fine at the high end of the guideline range," and thus did not present a situation in which the proposed forfeiture exceeded the statutory maximum. 2024 WL 4171435, at *1.

from this maximum by only a factor of two," and the other Bajakajian factors supported forfeiture); Carlyle, 776 F. App'x at 572 (noting that the Eleventh Circuit "ha[s] 'upheld all forfeitures imposed by district courts in amounts up to twice the maximum authorized fine'" (quoting United States v. Sperrazza, 804 F.3d 1113, 1127 (11th Cir. 2015)). As the requested forfeiture is only about 1.4 times the statutory maximum, the Court finds that this factor weighs in Defendant's favor but is not dispositive.

The Court thus considers the remaining two Bajakajian factors. See United States v. Varrone, 554 F.3d 327, n.4 (2d Cir. 2009) (noting that "a forfeiture that exceeds the statutory maximum fine is not necessarily constitutionally excessive, and that the ultimate question before the court is how 'the amount of the forfeiture [compares] to the gravity of the defendant's offense'" (quoting Bajakajian, 524 U.S. at 336) (alteration in original)); see also United States v. Carlyle, 776 F. App'x 565, 572 (11th Cir. 2019) ("A forfeiture money judgment that is greater than the statutory maximum fine is not presumptively invalid but should receive close scrutiny rather than a presumption of constitutionality.").

First, Defendant belongs to the class of persons at whom the money laundering statute is principally directed. The money laundering statute was passed "to detect and punish financial transactions representing the proceeds of . . . unlawful activity." United States v. Aversa, 984 F.2d 493, 505 (1st Cir. 1993). Defendant was convicted of conspiring with Morose to use her bank accounts and rental car businesses to conceal money obtained from drug trafficking. There is little dispute that this is precisely the type of conduct targeted by Congress.

Second, a forfeiture of the magnitude the Government seeks is reasonably proportionate to the harm caused by Defendant's conduct. The trial evidence reflects a conspiracy involving five participants operating across two states over approximately two years, and the amount

laundered was approximately $2 million. The funds derived from a drug trafficking operation that brought millions of dollars' worth of fentanyl, a Schedule II narcotic, into the Commonwealth. Defendant appointed Morose as an officer of PK Motors and layered multiple transactions across business accounts to obscure the cash deposits. Even if she was not the ringleader and did not personally traffic drugs, these offenses are serious. Indeed, Congress passed the money laundering conspiracy statute in large part to "help combat the large amounts of money 'laundered' by the drug trade and organized crime." United States v. Buchanan, 987 F. Supp. 56, 65 (D. Mass. 1997).

Accordingly, upon consideration of all the factors, the Court finds that forfeiture of all three properties is not grossly disproportionate under Bajakajian.

## III. CONCLUSION

For the foregoing reasons, the Government's [Dkt. 160] Motion for Preliminary Order of Forfeiture is **GRANTED**. Preliminary Order of Forfeiture to follow.

**SO ORDERED.**

Dated: November 13, 2026

/s/ Angel Kelley
Hon. Angel Kelley
United States District Judge